# EXHIBIT A-6

1  Jamie B. Beaber (*Pro Hac Vice*)
     jbeaber@mayerbrown.com
2  Kfir B. Levy (State Bar No. 235372)
     klevy@mayerbrown.com
3  James A. Fussell, III (*Pro Hac Vice*)
     jfussell@mayerbrown.com
4  Tiffany A. Miller (*Pro Hac Vice*)
     tmiller@mayerbrown.com
5  William J. Barrow (*Pro Hac Vice*)
     wbarrow@mayerbrown.com
6  **MAYER BROWN LLP**
   1999 K Street NW
7  Washington, DC 20006
   Phone: 202.263.3000
8
   Robert G. Pluta (*Pro Hac Vice*)
9    rpluta@mayerbrown.com
   **MAYER BROWN LLP**
10 71 South Wacker Drive
   Chicago, IL 60606
11 Phone: 312.701.8641

12 Patricia L. Peden State Bar No. 206440
     Patricia.peden@leclairryan.com
13 **LECLAIRRYAN LLP**
   44 Montgomery Street
14 Suite 3200
   San Francisco, CA 94104
15 Phone: 415.913.4932

16 Attorneys for Plaintiff MAXELL, LTD.

17

18

19                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
20                       **SAN FRANCISCO DIVISION**

21

| | |
|---|---|
| 22  MAXELL, LTD., | Case No. 3:18-cv-01788-VC |
| 23          Plaintiff, | |
|       vs. | **RULE 4-3(E) DISCLOSURE OF THE** |
| 24  ASUSTEK COMPUTER INC., and | **OPINIONS OF DR. JOSHUA PHINNEY** |
| 25  ASUS COMPUTER INTERNATIONAL, | **CONCERNING CLAIM CONSTRUCTION** |
| 26          Defendants. | |

27

28

I.  INTRODUCTION

1. Pursuant to P.R. 4-3(e), Plaintiff Maxell, Ltd. ("Maxell") hereby identifies Dr. Joshua Phinney as an expert witness who will offer opinion testimony (either live or by declaration) related to the meaning of certain claim terms found within U.S. Patent Nos. 8,513,832 (the "'340 Patent"). He will also testify as to how a person of ordinary skill in the art who has read the '340 Patent specification would have understood certain claim terms at the time of the invention.

2. The topics discussed here are exemplary, not exhaustive. Depending on new information learned during discovery, positions taken throughout the case by ASUS, or opinions offered by ASUS's experts, Dr. Phinney may edit, add to, or otherwise refine the topics and expected testimony described herein. The following paragraphs illustrate the testimony that Dr. Phinney may offer regarding the proper construction of the disputed claim terms.

II. BASES OF OPINIONS

A. Qualifications

3. Dr. Phinney is a Principal Engineer in the Electrical Engineering and Computer Science practice at Exponent Inc., a multidisciplinary engineering and scientific consulting firm headquartered at 149 Commonwealth Drive in Menlo Park, California.  Dr. Phinney received a Ph.D. in Electrical Engineering from the Massachusetts Institute of Technology ("MIT") in 2005; a S.M. degree in Electrical Engineering from MIT in 2001; and a B.S. in Electrical Engineering from the University of Illinois, Chicago ("UIC") in 1999.

4. A tried and true copy of Dr. Phinney's current CV is attached.

5. After earning his Ph.D., Dr. Phinney joined Exponent and since then has led technical investigations pertaining to portable electronic devices, microcomputers, and electromechanical devices with embedded controllers.  His job responsibilities include analyzing hardware and software of these devices and related devices to understand their modes of failure, and testifying regarding these devices in legal

1 matters involving patents and trade secrets.

2    6.    Dr. Phinney has testified regarding the software-defined features, internal circuitry, and physical embodiments of electronic equipment.  Regarding software, he has have reviewed C, C++, Java, Visual Basic, and machine language source code for purposes of patent infringement and trade secret misappropriation.  In particular, he has testified regarding servo and interface software for mass-storage devices, including hard disk drives, as well as embedded software for the control of machines, consumer products, and computer peripherals.

   7.    Regarding electronics, Dr. Phinney has testified regarding the circuitry in microcomputers, portable electronic devices, peripherals, and machine controllers. In particular, he has testified regarding digital media devices, including music players, as well as the power-management circuitry in microprocessor-based equipment, including mobile phones, tablets, cameras, and laptops.  This power-management circuitry included circuitry and software to reduce power consumed by peripherals based on low-battery conditions.

   8.    Regarding the mechanical elements of electronic equipment, Dr. Phinney has testified regarding buttons and touch interfaces, connectors, linear and rotary actuators, position-measuring devices, and the design and construction of modular housings for computerized equipment and peripherals.  In particular, he has testified regarding spindle motors and linear/rotary actuators for disk drives and head/disk testers.

   **B.    Materials Considered**

   9.    In rendering his opinions, Dr. Phinney will rely upon and consider the above experience, as well as the '340 Patent, Plaintiff's and Defendants' proposed claim constructions, the claim construction charts and evidence submitted by the Parties, as well as all documents and evidence provided herein.

   **C.    Compensation**

10. Dr. Phinney is a salaried employee of Exponent, which charges an hourly rate of US $495 plus expenses for his work performed in connection with this action.

## III. LEVEL OF ORDINARY SKILL IN THE ART

11. Dr. Phinney will likely opine that a person of ordinary skill in the art at the time of the invention of the '340 Patent would have had a master's degree in electrical engineering, and one to two years of experience in the design and manufacturing of supervisory control systems for mass storage devices, or the equivalent.

## IV. BACKGROUND AND DISCUSSION

12. As background to the discussion of particular claim terms, this section provides a discussion of the sole claim of the '340 patent, which is directed to an information recording apparatus powered by a battery. When a system control means (such as a processor) in the information recording apparatus detects a decrease in the remaining battery level, it records managing information on information recording medium, such as an optical disk or EEPROM. This "managing information" (also called "intermediate information") can include file management information used to form a directory of stored files. *See* '340 Patent at Abstract.

13. Claim 1 of the '340 Patent recites:

> An information recording apparatus comprising:
>
> means for driving an information recording medium;
>
> recording means for recording data on said information recording medium;
>
> digital signal processing means for processing said data; and
>
> system control means for controlling said driving means, said recording means and said digital signal processing means, said system control means detecting a decrease in a residual storage of a battery supplying electricity to said information recording apparatus, producing managing information (intermediate information) utilized for managing data recorded on said information recording medium when the residual storage of a battery decreases, and recording the

- 3 -

Case No. 3:17-cv-00632-CAB (MDD)

1
2
      managing information on said information recording medium when said residual storage of the battery decreases.

3  '340 Patent, 4:24-31.

4      14. While the '340 states that the intermediate information may be recorded to an information recording medium such as a re-writable optical disk or write-once (WO) optical disk, it also states that intermediate information may be recorded to an electrically erasable programmable read-only memory (EEPROM). *Se*e, e.g., '340 Patent at 2:49-58, 9:41-56, Fig. 12. Whatever particular recording method is used, Claim 1 requires that the intermediate information is recorded on an "information recording medium." A person of ordinary skill would have reasonably inferred that the patentee wrote Claim 1 broadly enough to include an "information recording medium" that is a semiconductor memory, such as an EEPROM as shown in Fig. 12.

     15. Indeed, at the time of the invention, there were multiple portable media players that used semiconductor memories and encoding techniques to store compressed digital media files for playback. Examples of such portable media players circa 1998 include the AT&T FlashPAC, The Audible Player, and the Rio PMP300 all of which used electrically erasable (flash) memories to store digital data. Other media players, such as the Compaq Personal Jukebox, used miniaturized hard disk drives to store user data. With this diverse non-volatile storage landscape as a backdrop, the patentee chose to use words in Claim 1 that do not limit the invention to the particular embodiment of a video recording on an optical disk. For instance, the words "video" and "disk" do not appear in Claim 1. In addition, the specification uses the terms "recorded" and "recording" in relation to recording information to the EEPROM, not just to the optical disk. *See, e.g.*, '340 Patent at 9:52-56, stating that the intermediate information "recorded in the EEPROM" may be erased when a session is constructed or disk is finalized.

V.    **CLAIM TERMS**

    A.    **"means for driving an information recording medium battery"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| means for driving an information recording medium | Maxell contends that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** driving an information recording medium.<br><br>**Structure:** processor/controller (e.g., drive mechanism control unit 117) and motor 101 configured to drive information recording medium (for, e.g., DVD-ROM, DVD-RAM) as described at 4:24-31; or processor/controller (e.g., system control unit 104) configured to generate control signals to drive information recording medium (e.g., EEPROM) as described at 9:41-56. | Defendants contend that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** driving an information recording medium.<br><br>**Structure:** drive mechanism control unit 117, motor 101, and equivalents thereof as shown in Figure 1 and described in 4:24-31 of the 340 Patent |

16. The claim term "means for driving an information recording medium" appears in independent Claim 1 of the '340 Patent. Both Parties agree that 35 U.S.C. §112 ¶ 6 applies to this limitation, and performs the function "driving an information recording medium."

17. The specification of the '340 Patent does not explicitly delimit what structures correspond to the function of "driving an information recording medium." However, the specification does describe the operation of drive mechanism control unit 117:

> Under the control of a drive mechanism control unit 117, a servo signal processing unit 116 generates a servo signal on the basis of a signal from the RF amplifier 110 and controls the motor 101. The drive mechanism control unit 117 controls the servo signal processing unit 116 and digital signal processing unit 109 and performs a drive control in the optical disk recording and reproducing apparatus

1  '340 Patent, 4:24-31.  This passage includes the only uses of the words "drive"
2  in the '340 Patent specification, and other forms (such as "driving")  only
3  appear in Claim 1.
4       18.    From this description of the drive mechanism control unit, a person of
5  ordinary skill would have understood that "means for driving an information
6  recording medium" can include the processor and signals for controlling the "drive
7  mechanism" itself, e.g., mechanism components such as the spindle and seek
8  actuators that are part of an optical disk drive.
9       19.    In addition, since the information recording medium can include a
10 semiconductor memory such as an EEPROM, a person of ordinary skill would have
11 understood that "means for driving an information recording medium" can include
12 the processor and signals for controlling the EEPROM.  Such structures could include
13 a processor (e.g., system control unit 104) that produces electrical signals for
14 controlling the EEPROM via a bus, as depicted in Fig. 12 of the '340 Patent.
15       20.    Dr. Phinney will likely opine that the foregoing examples comport with
16 his understanding, gained through his experience and training, that "driving" an
17 information recording medium includes the basic sense of controlling a storage
18 device that records information.  In the context of the '340 Patent, a person of
19 ordinary skill in the art would have understood that the function of  "driving an
20 information recording means" is performed by *either*  "processor/controller (e.g.,
21 drive mechanism control unit 117) and motor 101 configured to drive  information
22 recording medium (for, e.g., DVD-ROM, DVD-RAM);" *or* "processor/controller
23 (e.g., system control unit 104) configured to generate control signals  to drive
24 information recording medium (e.g., EEPROM)" as proposed by Plaintiffs.  Dr.
25 Phinney will note that this conclusion is supported by the intrinsic and extrinsic
26 identified by Plaintiff, as well as the knowledge of a person of ordinary skill in the
27 art.
28

21. Adopting ASUSTeK's proposed construction of "means for driving an information recording medium" would unnecessarily exclude from the scope of Claim 1 embodiments in which the EEPROM is an information recording medium to which information, such as intermediate information, can be recorded.

B. **"means for recording data on said information recording medium"**

| Claim Term | Plaintiff's Proposed Construction | ASUSTek's Proposed Construction |
|---|---|---|
| recording means for recording data on said information recording medium | Maxell contends that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** recording data on said information recording medium<br><br>**Structure:** laser pickup 111 as shown in Figure 1 and described in 4:5-14; or EEPROM and processor/controller (e.g., system control unit 104) configured to record on the information recording medium as described at 9:41-56, and equivalents thereof. | Defendants contend that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** recording data on said information recording medium<br><br>**Structure:** laser pickup 111, and equivalents thereof as shown in Figure 1 and described in 4:5-14 and 4:67-5:4 of the 340 Patent |

22. The claim term "recording means for recording data on said information recording medium" appears in independent Claim 1 of the '340 Patent. Both Parties agree that 35 U.S.C. §112 ¶ 6 applies to this limitation, and performs the function "recording data on said information recording medium."

23. The specification of the '340 Patent does not explicitly delimit what structures correspond to the function of "recording data on said information recording medium." However, the specification of the '340 Patent describes, for an optical disk embodiment, the flow of data involved in the recording operation:

> A flow of data of the recording operation is as follows. A system control unit 104 receives a recording start instruction from an operating unit 103. Under the control of the system control unit 104, input data inputted from an external input device 106 through an input interface unit 105 is stored into a buffer memory 107. The stored input

> data is processed by a data encoding unit 108. By a laser pickup (P.U.) 111, the processed data is stored through a digital signal processing unit 109 and a radio frequency amplifier (RF amplifier) 110 into the optical disk 102 attached to the motor 101.

'340 Patent, 4:5-14.  From this passage, a person of ordinary skill would understand that in an optical disk embodiment, the recording function is performed by the laser pickup (P.U.), by which the digital signal processing unit 109 and RF amplifier 110 store data "into" the optical disk.

24.     In addition, the '340 Patent specification also describes how the intermediate information can be recorded to an EEPROM:

> In the embodiment of FIG. 9, although the intermediate information is recorded in the recording area of the optical disk, ***another embodiment for recording the intermediate information is shown in FIG. 12.***
>
> FIG. 12 has a construction obtained by adding an EEPROM 1200 to the embodiment of FIG. 1. The EEPROM 1200 has a feature such that it can be rewritten by the ordinary writing operation and the written data is held even when a power source voltage is equal to 0V. Therefore, by writing the intermediate information into the EEPROM 1200 , a session can be constructed at an arbitrary time point.
>
> ***The intermediate information recorded in the EEPROM 1200*** can be erased when a session is constructed by using the intermediate information or after completion of a finalization (operation to finally record the Lead-out area and complete the optical disk).

'340 Patent, 9:41-56 (*emphasis added*).    This passage also uses the words "recorded" and "recording" in reference to the EEPROM, from which disclosure a person of ordinary skill would understand that a processor (e.g., system control unit 104) and circuitry internal to EEPROM 1200 perform the function of "recording data" to the EEPROM.

25.     As explained previously, the information recording medium can be a semiconductor memory such as an EEPROM.  So, while a person of ordinary skill

1  would have understood that "means for recording data on said information recording
2  medium" includes a laser pickup for an optical disk drive, it also includes circuitry
3  (e.g., in system control unit 104 and EEPROM 1200 itself) for "recording data" to the
4  EEPROM.
5     26.    Dr. Phinney will likely note that all of the foregoing examples and
6  definitions comport with his understanding, gained through his experience and
7  training, that "recording data" on an information recording medium involves
8  structures that effect storage.  In the context of the '340 Patent, a person of ordinary
9  skill in the art would have understood that the function of "recording data" is
10 performed by _either_ "laser pickup 111 as shown in Figure 1 and described in 4:5-
11 14"; _or_ "EEPROM and processor/controller (e.g., system control unit 104) configured
12 to record on the information recording medium" as proposed by Plaintiffs.  Dr.
13 Phinney will note that his opinion is supported by the intrinsic and extrinsic evidence
14 cited by Plaintiff, as well as the knowledge of a person of ordinary skill in the art.
15    27.    Adopting ASUSTeK's proposed construction of "means for recording
16 data on said information recording medium" would unnecessarily exclude from the
17 scope of Claim 1 embodiments in which the EEPROM is an information recording
18 medium to which intermediate information can be recorded.

C.      "digital signal processing means for processing said data"

| Claim Term | Plaintiff's Proposed Construction | ASUSTek's Proposed Construction |
|---|---|---|
| digital signal processing means for processing said data | Maxell contends that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** processing said data<br><br>**Structure:** digital signal processing unit 109 configured to process data using one or more of the algorithms set forth at 1:29-37 (image compression); processor/controller (e.g., system control unit 104) configured to process data stored on information recording medium (e.g., EEPROM) as described at 9:41-56, and equivalents thereof. | Defendants contend that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** processing said data<br><br>**Structure:** digital signal processing unit 109, and equivalents thereof as shown in Figure 1 and described in 4:5-14 of the 340 Patent |

28.     The Parties are in agreement that the component responsible for the foregoing function is the digital signal processing unit. Nevertheless, Dr. Phinney will likely opine that Defendants' construction improperly excludes the image compression algorithms set forth at 1:29-37, as well as the EEPROM embodiment for the information recording medium expressly disclosed at 9:41-56.

D.      "system control means"

| Claim Term | Maxell's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| system control means for controlling said driving means, said recording means, and said digital processing means [, said system control means detecting a decrease in | Maxell contends that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** controlling said driving means, said recording means, | Defendants contend that 35 U.S.C. §112 ¶ 6 applies to this limitation.<br><br>**Function:** controlling said driving means, said recording means, and said digital processing means, said system |

| | | |
|---|---|---|
| a residual storage of a battery supplying electricity to said information recording apparatus, producing managing information (intermediate information) utilized for managing data recorded on said information recording medium when the residual storage of a battery decreases, and recording the managing information on said information recording medium when said residual storage of the battery decreases] | and said digital processing means.<br><br>**Structure:** system control unit 104 configured to control using one or more of the algorithms set forth at 4:5-14, 4:15-23, and equivalents thereof. | control means detecting a decrease in a residual storage of a battery supplying electricity to said information recording apparatus, producing managing information (intermediate information) utilized for managing data recorded on said information recording medium when the residual storage of a battery decreases, and recording the managing information on said information recording medium when said residual storage of the battery decreases<br><br>**Structure:** system control unit 104, and equivalents thereof as described in Figure 1 and described in 4:5-14 and 8:32-36 of the 340 Patent |

29.     The claim term "system control means for controlling said driving means, said recording means, and said digital processing means" appears in independent Claim 1 of the '340 Patent.  Maxell contends that 35 U.S.C. §112 ¶ 6 applies to this limitation, while Defendants contend that the final element of Claim 1 in its entirety should be construed as a means-plus-function term.

30.     One difference between the constructions proposed by the Parties relates to the function of the "system control means."  Defendants' position is that the function is provided by the last limitation of Claim 1, taken in its entirety after the phrase "system control means for."  Maxell's proposed construction is more terse, leaving the words of Claim 1 (starting with "said system control means for") to describe what the "system control means" must do to infringe, rather than what it is required to be _called_ a "system control means."  The Parties agree that the system

1  control unit 104, or its equivalents, performs the functions that each Party has
2  identified.
3        31.    Dr. Phinney will likely note that '340 Patent specification describes the
4  "system control unit 104" divorced from the particular functional requirements
5  required by Defendants.  In the specification, embodiments include a  "system control
6  means" (i.e., system control unit 104) that does *not* detect a decrease in the residual
7  storage of a battery, and yet is still called the "system control unit."  Dr. Phinney will
8  likely opine that these passages demonstrate that a "system control means for
9  controlling said driving means, said recording means, and said digital processing
10 means" need not perform all of the functions required by Defendants in order to be
11 <u>called</u> a "system control means," even if performing these functions is required for
12 infringement.
13       32.    For instance, the specification of the '340 Patent describes, for an optical
14 disk embodiment, the flow of data involved in the recording operation:

> A flow of data of the recording operation is as follows. A system control unit 104 receives a recording start instruction from an operating unit 103. Under the control of the system control unit 104, input data inputted from an external input device 106 through an input interface unit 105 is stored into a buffer memory 107. The stored input data is processed by a data encoding unit 108. By a laser pickup (P.U.) 111, the processed data is stored through a digital signal processing unit 109 and a radio frequency amplifier (RF amplifier) 110 into the optical disk 102 attached to the motor 101.

'340 Patent, 4:5-14.

       33.    Likewise, the '340 Patent specification also describes how the system control unit is involved in the read-out operation:

> A flow of data in the reproducing operation is as follows. The data of the optical disk 102 attached to the motor 101 is read by the laser pickup (P.U.) 111 and is outputted as digital data from a data decoding unit 112 through the radio frequency amplifier (RF amplifier) 110 and digital signal processing unit 109. Under the control of the system control unit 104, the digital data is outputted to a

- 12 -

Case No. 3:17-cv-00632-CAB (MDD)

1
2
      display unit. 113 or an external output device 115 through an output interface unit 114.

3
'340 Patent, 4:15-23.

4
      34.   Dr. Phinney will likely conclude that a person of ordinary skill in the art would have understood the claim term "system control means for controlling said driving means, said recording means, and said digital processing means" to perform the function "controlling said driving means, said recording means, and said digital processing means" as proposed by Defendants.  Dr. Phinney will explain that his opinion is supported by the intrinsic evidence identified herein (and in Plaintiff's claim chart at Exhibit A), which clarifies that a "system control means for controlling said driving means, said recording means, and said digital processing means" need not perform all of the functions required by Defendants in order to be *called* a "system control means," even if performing these functions is required for infringement.



# E<sup>x</sup>ponent®
Engineering & Scientific Consulting

## Joshua W. Phinney, Ph.D., P.E.

**Principal Engineer | Electrical Engineering & Computer Science**
420 Lexington Avenue, Suite 1740 | New York, NY 10170
(212) 895-8125 tel | jphinney@exponent.com

## Professional Profile

Dr. Phinney's background is in electrical and electronic engineering, particularly related to power electronics, electromagnetics, and electromechanics. His specialties include power supplies, radio-frequency electronics, control systems, printed circuits, integrated-circuit packaging, magnetics design, and power transmission and distribution. He has related experience in embedded software, acoustics, and numerical methods for optimization and simulation.

At Exponent, Dr. Phinney has assisted clients with identifying the root cause of failures in mobile electronic devices, industrial and automotive controllers, capacitors, transformers, amplifiers, and power supplies. He has testified in patent and trade secret litigation regarding computer hardware and software, audio circuitry, mobile telephones, tablets, power supplies, control systems, hard disk drives, and electronic instruments. In addition, Dr. Phinney has assisted clients with electromagnetic assessment issues pertaining to utility and communication infrastructure. These issues include permitting, interference, and environmental impact of radar, AC and HVDC transmission lines, substations, photovoltaic installations, generators, broadcast antennas, and electrified mass transit systems.

Dr. Phinney received his Ph.D. in Electrical Engineering from the Massachusetts Institute of Technology. His doctoral work centered on miniaturization of power converters and electromechanical power conversion. He has related experience in radio-frequency electronics (particularly phase-locked loops and RF amplifiers), network synthesis, system identification, and control. Dr. Phinney is the co-inventor on patents for improving the performance of capacitors, EMI filters, and common-mode chokes.

## Academic Credentials & Professional Honors

Ph.D., Electrical Engineering, Massachusetts Institute of Technology (MIT), 2005

S.M., Electrical Engineering, Massachusetts Institute of Technology (MIT), 2001

B.S., Electrical Engineering, University of Illinois, Chicago, *summa cum laude*, 1999

B.A., Ancient and Classical Languages, Philosophy, Wheaton College, 1995

2004 IEEE Power Electronics Society Transactions Prize Paper Award (for the paper "Filters with Active Tuning for Power Applications")

2003 William M. Pormoy Prize Paper Award (Awarded by the Power Electronics Devices and Components Committee of the IEEE Industry Applications Society)

## Licenses and Certifications

Licensed Professional Electrical Engineer, New York, #084129

## Academic Appointments

Adjunct Professor, Hofstra University, 2008

## Professional Affiliations

Institute of Electrical and Electronic Engineers (member)

Tau Beta Pi

## Languages

German

## Patents

U.S. Patent No. 7,242,269: Filter Having Parasitic Inductance Cancellation, July 2007 (with D.J. Perreault and T.C. Neugebauer).

U.S. Patent No. 6,937,115: Filter Having Parasitic Inductance Cancellation, February 2002 (with D.J. Perreault and T.C. Neugebauer).

## Publications

Phinney JP, Perreault DJ, Lang JH. Synthesis of lumped transmission-line analogs. IEEE Transactions on Power Electronics 2007; 22(4):1531-1542.

Phinney JP, Perreault DJ, Lang JH. Radio-frequency inverters with transmission-line input networks. IEEE Transactions on Power Electronics 2007; 22(4):1154-1161.

Phinney JP, Perreault DJ, Lang JH. Multi-resonant microfabricated inductors and transformers. IEEE Power Electronics Specialists Conference 2004; 4527-4536.

Phinney JP, Perreault DJ. Filters with active tuning for power applications. IEEE Transactions on Power Electronics 2003; 18(2):636-647.

Neugebauer TC, Phinney JP, Perreault DJ. Filters and components with inductance cancellation. IEEE Transactions on Industry Applications 2002; 939-947.

Phinney JP, Perreault DJ. Filters with active tuning for power applications. IEEE Power Electronics Specialists Conference 2001; 363-370.

Batzer MA, Arcot SS, Phinney JP, et al. Genetic variation of recent Alu insertions in human populations. Journal of Molecular Evolution 1996; 42(1):22-29.



Exponent
420 Lexington Avenue
Suite 1740
New York, NY 10170

telephone 212-895-8100
facsimile  212-895-8199
www.exponent.com

## Joshua W. Phinney, Ph.D., P.E.
**Principal Engineer**

**Testimony**

*Convolve, Inc. and MIT v. Compaq Computer Corp. and Seagate Technology, LLC.* Case No. 00 CIV. 5141 in the United States District Court, Southern District of New York. Deposition 2008

*IBM v. ASUSTek Computer, Inc., ASUS Computer International, Pegatron Corporation, and Unihan Corporation,* Certain Computer Products, Computer Components and Products Containing Same, Case No. 337-TA-628 before the International Trade Commission. Deposition and trial 2008

*Xentaur Corporation v. Bedros Bedrossian,* Index No, 23403/06 in the Supreme Court of the State of New York, County of Suffolk. Trial testimony 2010

*Apple Inc. v. Samsung Electronics Corp., et al,* Certain Electronic Digital Media Devices and Components Thereof, Case No. 337-TA-796 before the International Trade Commission. Deposition and trial 2011, 2012

*Guzik Technical Enterprises, Inc. v. Western Digital Corporation, et al.* Case No. 5:11-CV-03786-PSG, Northern District of California. Deposition 2013

*L-3 Communications Corporation et al v. Jaxon Engineering & Maintenance,* Civil Action No. 10-cv-2868-MSK-KMT, District of Colorodo. Deposition 2014

*Cypress Semiconductor Corp. v. Blackberry Ltd.,* IPR2014-00397 and IPR2014-00400 before the U.S. Patent Trial and Appeal Board.  Depositions 2014.

*Smart Skins LLC v. Microsoft Corporation.* Case No. 2:15-CV-00544-MJP in the United States District Court, Western District of Washington at Seattle.  Deposition 2016.

*Commonwealth of Puerto Rico Treasury Department v. OPG Technology Corp.*, Case No. 15-3125 in the in the United States District Court, District of Puerto Rico. Hearing testimony 2016.